RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0433p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LINDA K. BRUMBALOUGH,

　　　　　　*Plaintiff-Appellant,*

　　*v.*

CAMELOT CARE CENTERS, INC.,

　　　　　　*Defendant-Appellee.*

No. 04-5543

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 03-00206—R. Leon Jordan, District Judge.

Argued: July 29, 2005

Decided and Filed: November 2, 2005

Before: MOORE and COLE, Circuit Judges; WISEMAN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Carol S. Nickle, NICKLE & LaFEVOR, Knoxville, Tennessee, for Appellant. Robert L. Bowman, KRAMER, RAYSON, LEAKE, RODGERS & MORGAN, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Carol S. Nickle, James R. LaFevor, NICKLE & LaFEVOR, Knoxville, Tennessee, William O. Bush, LAW OFFICES OF WILLIAM BUSH, Cookeville, Tennessee, for Appellant. Robert L. Bowman, KRAMER, RAYSON, LEAKE, RODGERS & MORGAN, Knoxville, Tennessee, for Appellee.

---

**OPINION**

---

　　THOMAS A. WISEMAN, JR., District Judge. Linda K. Brumbalough ("Brumbalough"), Plaintiff-Appellant, was employed as the State Clinical Director by Camelot Care Centers, Inc. ("Camelot"). When she was terminated from her employment after taking a leave under the Family and Medical Leave Act ("FMLA"), Brumbalough filed this action against Camelot claiming that her termination was in violation of the FMLA.

　　On the parties' cross-motions for summary judgment, the district court granted summary judgment to Camelot, finding that Brumbalough was not on FMLA leave at the time she was

---

[*] The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

terminated and that Brumbalough had failed to submit a proper "fitness-for-duty" certification, which was needed before she could return to work. The district court alternatively concluded that even if Brumbalough had submitted a proper certification, Camelot had no obligation under the FMLA to reinstate her because she was unable to perform the essential functions of the State Clinical Director position. Later, Brumbalough also attempted to amend her complaint to add emotional distress damages. The district court denied Brumbalough's motion to amend.

For the reasons set forth below, we **AFFIRM** the district court's denial of Brumbalough's motion for partial summary judgment and **REVERSE** grant of summary judgment to Camelot. We **AFFIRM** the district court's denial of Brumbalough's motion to amend and **REMAND** the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Camelot provides treatment, care, and placement for abused and neglected children in the custody of state Department of Children Services. It also provides counseling to non-custodial children and to troubled families. Camelot has five local offices in Tennessee and also operated one residential treatment center during Brumbalough's employment. Each local office has a Clinical Director, who is responsible for the treatment needs of the children assigned to the office.

Brumbalough was hired as a Clinical Director in October 1997 and was assigned to the local office in Oak Ridge, Tennessee. Her responsibilities included admission of children into the program, treatment evaluations, recruiting and training of foster parents, monitoring the movement of children in the program, supervision of staff and the clinical program, chart auditing, and event planning.

In July 2000, Brumbalough was promoted to the position of State Clinical Director. As the State Clinical Director, Brumbalough supervised Clinical Directors of the five Tennessee offices and the residential treatment center. This entailed answering questions from the local Clinical Directors regarding admissions, evaluations, and placement of children. Brumbalough also filled in as the Clinical Director for the local offices during temporary vacancies. In 2001, Brumbalough was traveling almost every day and worked on paperwork on the weekends. Consequently, Brumbalough worked over sixty hours a week. As the State Clinical Director, Brumbalough was responsible for training new employees and was also responsible for handling emergencies involving children under Camelot's care. Because of such responsibilities, Brumbalough was required to be on call twenty-four hours a day, seven days a week.

On June 11, 2001, Brumbalough sent an email to Julie Tesore, the Program Director of the Brentwood Office, informing her that she was having some health problems and she needed to cut back on her hours down to 40-45 hours per week. Following her appointment with her doctor, Ted Stallings, Brumbalough told Camelot that she was recommended to take the rest of the week off. On June 17, 2001, Brumbalough informed Camelot of her intent to have her doctor sign the FMLA certification forms, since she was having more health problems and would need to take more time off. Gretchen Jolly, Director of Human Resources, sent an FMLA Certification form to Brumbalough. The Certification from Dr. Stallings provided that Brumbalough was presently incapacitated and that she would need about two to three months to recover. Brumbalough's FMLA leave was approved as of June 11, 2001. The twelve-week period of FMLA leave, if taken in full, was to expire on September 11, 2001.

Camelot sent Brumbalough an "Employer Response Form for FMLA leave" after her leave request, which stated that Brumbalough was to inform Camelot of her status every thirty days, that Brumbalough was required to present a fitness-for duty certification prior to being restored to

employment and that she would need recertification from her physician after two months in order to get approval for further FMLA leave because her doctor was vague on her return to work date.

On July 27, 2001, Brumbalough sent an email to Michele DiSorbo, Camelot's National Clinical Director, informing her that she felt ready to come back to work in "the next week or so." Ms. Jolly sent Brumbalough a letter on July 31, 2001, acknowledging Brumbalough's request to return to work and requesting that she provide a fitness-for-duty certification no later than August 7, 2001. The letter said, "we required that you provide us with a date certain for your return. We also require a certification letter from your physician that you are indeed fit for duty to return to your old job. I have enclosed a letter for your doctor to review and sign so that we can adequately assess your planned return to full-time employment." (J.A. at 102.) The letter also included a copy of Brumbalough's job description and procedures. Dr. Stallings was asked to read the statement contained in the letter, put a date that Brumbalough could return to work, sign it and send it back to Camelot. Brumbalough received the letter on August 4, 2001.

On August 3, 2001, Brumbalough had an appointment with Dr. Stallings and he provided her with a handwritten note on a prescription pad stating, "She may return to work on 8/13/01. She should only work a 40-45 hour week and limit her out-of-town travel to 1 day per week." (J.A. at 109.) Brumbalough claims that she faxed this note to Camelot; Camelot denies receiving it.

On August 8, 2001, Ms. Jolly mailed another letter stating that Camelot had not received a response to its request for a fitness-for-duty. The letter set a new deadline of August 10, 2001, and stated that if Camelot did not get the certification by August 10, 2001, it would consider Brumbalough's employment with Camelot terminated and would proceed to fill her position. This letter was delivered on August 9, 2001.

Brumbalough sought the assistance of attorney Kevin Shepherd in an attempt to get an extension of time for submitting the paperwork from Dr. Stallings. Upon Mr. Shepherd's request, Ms. Jolly extended the deadline for Brumbalough to August 15, 2001. On August 10, 2001, Brumbalough received another overnight letter from Ms. Jolly, which confirmed the extended deadline of August 15, 2001 and stated if Brumbalough was unable to report for duty on or before Wednesday, August 15, 2001 with the fitness-for-duty certification, Camelot would consider her employment terminated. Brumbalough failed to submit the certification by this new deadline and was informed of her termination by a letter dated August 17, 2001.

On August 18, 2001, Dr. Stallings prepared a letter which stated that Brumbalough may now return to work with certain modifications such as limiting her out-of-town travel to once a week and not working more than 45 hours a week. The letter indicated that the restrictions were expected to last for the next two months, at which time she would be reevaluated. Brumbalough was provided with this letter on August 22, 2001. Ms. Jolly testified that Camelot never received it and Brumbalough testified that she could not say for sure if anyone sent the letter to Camelot.

On June 29, 2001, which was during Brumbalough's absence, Camelot placed an ad for the Clinical Director position for the Brentwood office in the *Tennessean*, a local newspaper. Kristi Buckley, the Tennessee State Director of Programs, testified that the advertisement in the paper was for a local Clinical Director position but Camelot kept in mind the prospect that Brumbalough might not be able to return as State Clinical Director as applicants were interviewed. Donna Fisher was interviewed for the local Clinical Director position and was ultimately offered the dual position of Clinical Director for the Brentwood office and State Clinical Director on August 16, 2001. Ms. Buckley testified that due to an upcoming corporate merger, Ms. Fisher was hired to fill both positions until Camelot's new corporate structure was settled. Ms. Fisher started at Camelot on September 10, 2001.

Ms. Buckley testified that Camelot classified the State Clinical Director as "salaried exempt" because that person must be on call 24/7 and usually the position required a workweek of 50-60 hours. Ms. Buckley also confirmed that the same is true for the Clinical Director's position because they are also on call 24/7, subject to call out and are expected to be in the office during the day to handle the nine-to-five functions. Ms. Jolly did state, however, that the State Clinical Director would not need to work sixty plus hour workweeks on a regular basis if Camelot was staffed properly and did not have the vacancies in the Clinical Director positions for the local offices. However, she testified that she could not guarantee that Brumbalough was not going to work over forty-five hours a week due to Camelot's staffing problems. At the time Brumbalough was terminated, there were vacant clinical director positions in a couple of local Camelot offices.

On April 11, 2003, Brumbalough filed suit against Camelot, alleging that Camelot had interfered with her rights under the FMLA by terminating her while she was on FMLA leave and refusing to reinstate her. On December 19, 2003, Camelot filed a motion for summary judgment and, on December 31, 2003, Brumbalough filed a motion for partial summary judgment on the issue of liability. On January 23, 2004, Brumbalough filed a motion to amend her complaint to add a claim for emotional distress under the FMLA. The district court denied Brumbalough's summary judgment motion, granted Camelot's motion and subsequently denied Brumbalough's motion to amend her complaint dismissing this action. This timely appeal on the district court's decision on all motions ensued.

## II. STANDARD OF REVIEW

### A. Motion for Summary Judgment

We review a district court's order granting summary judgment *de novo*. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997).

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 587-88 (1986).

However, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party must come forward with some significant probative evidence to support its claim. *Id*. If the nonmoving party fails to make a sufficient showing on an essential element, which it has the burden of proof, the moving party is entitled to summary judgment. *Id*. at 323.

After reviewing the evidence, the court must determine whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id*. at 248. If the court concludes that a reasonable jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment.

### B. Motion to Amend Complaint

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint shall be freely given when justice so requires. Fed. R. Civ. P 15(a). In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue

prejudice to the opposing party, and futility of amendment. *See Coe v. Bell*, 161 F.3d 320, 341-42 (6th Cir. 1998) (citing *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir.1994) (citations omitted)).

We review the district court's decision to deny the plaintiff's motion to amend the pleadings for abuse of discretion. *Dubuc v. Green Oak Township*, 312 F.3d 736, 743 (6th Cir. 2002). However, when the district court bases such a denial on the fact that the amendment would be futile, we review the decision *de novo*. *Id*. at 744.

## III.  ANALYSIS

### A.  The FMLA

The FMLA requires certain employers to provide their employees with up to twelve weeks of unpaid leave in the event that the employee has a serious medical condition. 29 U.S.C. § 2612(a)(1)(D). However, this entitlement is not without restrictions. The employer may require the employee to submit a medical certification of the employee's condition prior to the leave, or as soon as possible, if the leave was taken suddenly. 29 U.S.C. § 2613; 29 C.F.R. § 825.305(b). As long as the employee is taking FMLA leave, the employer may require the employee to submit a "recertification" of the medical condition as often as every thirty days. 29 C.F.R. § 825.308.

Furthermore, upon proper notification, the employer may require the employee to submit a "fitness-for-duty" certification by her health care provider as a condition of returning to work. 29 C.F.R. § 825.310. If the employee has not submitted a required "fitness-for-duty" certification by the time the employee's FMLA leave has ended, then the employee may be terminated. 29 C.F.R. § 825.311(c). The FMLA also does not require the employer to reinstate an employee after her leave has ceased if the employee is unable to fulfill the essential functions of her job. 29 C.F.R. § 825.214(b).

### B.  Brumbalough's Motion for Partial Summary Judgment

Brumbalough appeals the district court's denial of her motion for partial summary judgment on the issue of Camelot's liability. On appeal, Brumbalough argues that the district court erred in denying her motion because she was still on FMLA leave when she was terminated.

According to Brumbalough, Camelot improperly required her to submit a fitness-for-duty certification under the threat of termination because the FMLA only permits such an ultimatum to be made when the employee's FMLA leave has concluded. 29 C.F.R. § 825.311(c) ("[U]nless the employee provides either a fitness-for-duty certification or a new medical certification for a serious health condition *at the time FMLA leave is concluded*, the employee may be terminated.") (emphasis added).

In denying Brumbalough's motion, the district court found that Brumbalough ended her leave when she notified Camelot of her intent to return to work on July 27, 2001. Brumbalough asserts that her FMLA leave did not conclude either until she was able to obtain the medical certification required by Camelot for her to return to work or, in the alternative, until September 11, 2001. Therefore, Brumbalough argues, Camelot had no authority to terminate her on August 15, 2001.

While the FMLA grants up to twelve weeks of leave, the FMLA also permits the employer to require certain documentation before the leave may be covered under the Act. As previously mentioned, employers may require an employee to submit a recertification every thirty days in order to continue taking FMLA leave. 29 C.F.R. § 825.308(c). The employer must give the employee at least fifteen days to submit such recertification. *See* 29 C.F.R. § 825.308(d). If the

employee fails to provide the recertification and continues to take leave, her leave is no longer covered under the FMLA. 29 C.F.R. § 825.311(b).

In the present case, at the inception of Brumbalough's leave, Camelot requested that she submit a medical recertification form if she was still unable to return to work after two months of leave. (J.A. at 97-98.) Brumbalough's leave began on June 11, 2001, and Camelot indicated to her that her leave would continue until "on or about 8/11 - 9/11/01." (*Id.*) Camelot therefore, providing proper notification, required that Brumbalough submit a recertification by August 11, 2001—two months into her leave. Brumbalough failed to do so.[1] Accordingly, by August 11, 2001, Brumbalough was no longer covered under the FMLA. Consequently, our analysis must proceed to whether Camelot violated Brumbalough's right to *reinstatement* under the FMLA, not whether Brumbalough was unlawfully terminated during FMLA coverage.[2] The district court's denial of Brumbalough's motion for partial summary judgment is affirmed.

## C.  Camelot's Motion for Summary Judgment

Upon Camelot's motion for summary judgment, the district court granted the motion, finding that Camelot was entitled to terminate Brumbalough because she did not submit a proper fitness-for-duty certification at the conclusion of her FMLA leave, and alternatively, because she would have been unable to perform the essential functions of her employment had she been reinstated.

Brumbalough challenges the district court's decision arguing that summary judgment for Camelot was improper because: (1) Camelot had no authority to terminate Brumbalough for failure to submit a fitness-for-duty certification under 29 C.F.R. § 311(c) as her FMLA leave had not yet ended; (2) Dr. Stalling's note of August 3, 2001 qualified as a fitness-for-duty certification and whether Camelot received the August 3, 2001 fitness-for-duty certification is a question for the jury; and (3) there is a genuine issue of material fact regarding whether she would have been able to perform the essential functions of her employment.[3] Brumbalough also argues that Camelot should have provided her with an alternative position or a reduced leave schedule.

### 1.  The Fitness-For-Duty Certification

Camelot required Brumbalough to submit a fitness-for-duty certification by August 15, 2001 in order to be reinstated. Brumbalough claims that she sent a note from her doctor to Camelot on August 3, 2001, indicating that she was fit for duty. Brumbalough also claims that she spoke to Ms. Jolly, who told Brumbalough that the note was insufficient and that Camelot would require further documentation before reinstatement. Although Ms. Jolly testified that she never received this note, for the purposes of Camelot's motion for summary judgment, the district court properly assumed that Brumbalough had sent the note to Camelot.

The doctor's note, in its entirety, states, "[Linda Brumbalough] may return to work on 8/13/01[.]  She should only work a 40-45 hour work week and limit her out of town travel to 1 day

---

[1] This is probably because, at this point, Brumbalough felt she was able to return to work and was pursuing reinstatement.

[2] If Brumbalough had continued to take leave without submitting a recertification and without attempting to return to work, Camelot arguably would not have been able to immediately terminate Brumbalough, because the FMLA requires that the employer inform the employee in writing of the consequences of failing to recertify her illness. 29 C.F.R. § 825.305(a) and (d).  This is not the situation here, however, because Brumbalough attempted to return to work before her leave time had even ended.

[3] As discussed in Part B, Brumbalough was no longer on FMLA leave when she was terminated.  As such, the Court finds Brumbalough's first argument meritless.

per week." (J.A. at 109.) The district court concluded that this note "did not meet defendant's requirements for a fitness-for-duty certification," because it did not specify whether Brumbalough could perform the essential functions of her job. (J.A. at 31.) The district court therefore found that termination was proper because Brumbalough failed to provide a specific certification to her employer.

Although the FMLA permits employers to require a fitness-for-duty certification prior to reinstatement, the relevant regulation states the following:

> An employer may seek fitness-for-duty certification only with regard to the particular health condition that caused the employee's need for FMLA leave. *The certification itself need only be a simple statement of an employee's ability to return to work.* A health care provider employed by the employer may contact the employee's health care provider with the employee's permission, for purposes of clarification of the employee's fitness to return to work. No additional information may be acquired, and clarification may be requested only for the serious health condition for which FMLA leave was taken. *The employer may not delay the employee's return to work while contact with the health care provider is being made.*

29 C.F.R. § 825.310(c) (emphasis added). There is no controlling case law on what a "simple statement of an employee's ability to return to work" must include to be sufficient under the regulations. However, a plain reading of this regulation indicates that the fitness-for-duty certification need only state that the employee can return to work. While the employer may require more information, the regulation clearly states that the employer cannot delay reinstating the employee simply because the employer is obtaining further information or clarification from the employee's health care provider. *Id.* Moreover, an employer may not impose requirements that conflict with the FMLA and its regulations. *Cavin v. Honda*, 346 F.3d 713, 723 (6th Cir. 2003).

This view is bolstered by the fact that the FMLA and accompanying regulations lay out in specific detail what must be included in an initial medical certification, whereas the regulations expressly state that only a simple statement is needed in a fitness-for-duty certification. *Compare* 29 U.S.C. § 2613(b) (stating that medical certification of a serious health problem will be "sufficient" when it includes the date that the problems began, the probable duration of the ailment, all other appropriate medical facts regarding the condition, a statement that the employee is unable to perform work functions, as well as any requirements regarding intermittent leave"), *with* 29 C.F.R. § 825.310(c) (requiring only a "simple statement" of the employee's ability to return to work). *See also Cooper v. Olin Corp.*, 246 F.3d. 1083, 1090 (8th Cir. 2001) (observing that there are more stringent requirements for medical certification than for the fitness-for-duty certification); *Mathews v. Fairview Health Servs.*, No. 01-2151, 2003 WL 1842471, at *1, 4 (D. Minn. 2003) (finding that a return-to-work slip by a doctor which stated only that the employee could return to work and should not work more than 40 hours in a two-week period, was a sufficient fitness-for-duty certification which required immediate reinstatement); *Underhill v. Willamina Lumber Co.*, No. 98-630-AS, 1999 WL 421596, at *7 (D. Or. 1999) (finding that a letter from the employee's doctor stating that the employee can return to work is specific enough to constitute a fitness-for-duty certification and require reinstatement "regardless of whether Defendant had concerns about plaintiff's ability to do his job").

Accordingly, we hold that once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been

triggered under the FMLA.[4]   Therefore, we reverse the district court's conclusion that Brumbalough's fitness-for-duty certification was inadequate and conclude that Camelot was required to reinstate Brumbalough upon receipt of Dr. Stalling's August 3, 2001 note.  If Camelot decided that the same note was insufficient as a fitness-for-duty certification, it should have sought clarification from Brumbalough's doctor.  Since, in this case,  there is a genuine issue as to the material fact of whether Camelot received the August 3, 2001 note, we remand the case for further fact-finding.

## 2.  Essential Functions of Employment

In granting Camelot's motion for summary judgment, the district court alternatively concluded that regardless of the timely submission of a fitness-for-duty certification, Camelot was entitled to terminate Brumbalough because Brumbalough would have been unable to perform the "essential functions" of her job upon her return.  *See* 29 C.F.R. § 825.214(b) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA.").

Determining what functions are "essential" to a particular position is a question of fact.  *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314-15 (6th Cir. 2001) (stating that whether the employee could have returned to his old job upon the conclusion of his FMLA leave is a question of fact); *see also Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) (holding that determination of whether qualifications are essential functions of a job requires the court to engage in a highly fact-specific inquiry and that such a determination should be based on more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved); FEDERAL AND STATE GUIDE TO EMPLOYEE MEDICAL LEAVE BENEFITS AND DISABILITIES LAW 5-120 (2005) (stating that under the ADA—which also uses the term "essential  functions"—determining "whether or not a particular job function is essential requires a factual determination made on a case-by-case basis") (citing 29 C.F.R. pt.1630 App. § 1630.2(n)).

The parties presented the following evidence regarding whether Brumbalough could perform the essential functions of the State Clinical Director if she had been reinstated after her leave concluded.

In a letter that Camelot sent to Brumbalough's doctor, the company stated:

> In considering your decision to so certify [that Brumbalough is fit for duty], we ask that you review Linda's job description and a related document entitled 'Procedure For Supervision of Clinical Managers and Other Clinical Supervisors.' . . . We also ask that you consider that Linda's job as involved in the past, and will likely involve in the future, the requirement that Linda be 'on-call' twenty-four hours a day, seven days a week.  In addition, during crisis situations or whenever she is required to act as a substitute clinical director when a vacancy occurs in one of the facilities she supervises, she may be working beyond a typical forty (40) hour workweek.  Finally, her travel schedule of one visit per month to all of the facilities she supervises will remain intact, as will the requirement that she conduct quarterly reviews of her facilities.

---

[4]The employer may, of course, determine that the doctor's work restrictions render the employee unable to perform the essential functions of her job.  *See infra* Part C2.  However, this is a separate issue from whether the employee initially complied with her regulatory obligation to submit the fitness-for-duty form in a timely manner.

(J.A. at 103.) A review of Camelot's Job Description Form for the State Clinical Director programs reveals nothing helpful because it fails to quantify the number of hours the State Clinical Director may have to work. (J.A. at 105-107.) The Form, in a section entitled "Essential Duties and Responsibilities," only lists, in a qualitative fashion, the people that State Clinical Director will oversee, the programs that the State Clinical Director will supervise, etc. (J.A. at 105.) The second document that was sent to Brumbalough's doctor describes the procedures for supervision of clinical managers, and its only relevance here is that it lists "individual case consultations and emergency on-call, as needed" as one of the State Clinical Director's supervisory duties. (J.A. at 108.)

Brumbalough's initial fitness-for-duty certification stated that she should only work a 40-45 hour workweek and limit her out-of-town travel to one day per week. A second letter written by Brumbalough's doctor on August 18, 2001 stated that Brumbalough may "return to work with some modifications of duties while she continues to improve. She should not drive more than 1 day per week as far as going out of town on business and she should not work more than a 45 hour work week. This restriction will last for the next 2 months. She will be reevaluated then." (J.A. at 437.)

Brumbalough also submitted an affidavit in which she stated that, given her familiarity with what the State Clinical Director position entails, she would have been able to perform the essential functions as set out in the job description with Dr. Stallings' restrictions. (J.A. at 397.) Brumbalough also stated that she would be able to travel to each facility once a month by traveling one day a week. (*Id.*) However, Camelot points out that in her deposition testimony, Brumbalough admitted that she had, on occasion, previously worked 60 hours a week, and that during those times she felt the job required her to do so. (J.A. at 190-91.)

Ultimately, the district court found that there was no genuine issue of material fact regarding what the essential functions of the State Clinical Director position are and whether Brumbalough could perform them. The court held that Brumbalough's work restrictions would render her unable to perform the essential functions of the State Clinical Director position because the position requires her to be on-call twenty-four hours per day, seven days a week. In so holding, the court reasoned that even if Brumbalough were able to complete a forty-five hour workweek, she would not be able to work more hours if "a crisis arose requiring her attention and additional travel . . . ." (J.A. at 35.)

There is some ambiguity regarding the number of hours the State Clinical Director is required to work in order to fulfill all the required responsibilities. Although Camelot's letter asserted that Brumbalough may have to work over forty hours a week occasionally, nothing in Camelot's Job Description or letter states with precision the amount of time Brumbalough may need to work over forty hours. Furthermore, although Brumbalough admitted that she had previously worked sometimes fifty to sixty hours a week, such admission is not proof that working these types of hours is "essential" to the job.[5]

Accordingly, the Court finds that Brumbalough has shown a genuine issue of material fact by: (1) testifying that, given her knowledge of what the position entails as well as the written job description, she could fulfill her responsibilities over the next two months by working forty-five hours a week and traveling one day a week, as she has done in the past; (2) presenting Camelot's letter to her doctor which does not state that Brumbalough would need to work 60-70 hours; and (3) presenting the written job description. Although it may be the case that Brumbalough could not fulfill all her obligations given her medical restrictions, we conclude that further findings by the fact-

---

[5]It may have been, for example, that Brumbalough was doing more than was necessary during those times, or that she was inefficient.

finder are necessary to determine what constitutes the essential functions of the job and whether Brumbalough was able to perform such functions.

### 3. Alternative Reinstatement Options

Because we reverse and remand on other grounds, we need not consider Brumbalough's argument that she was entitled to alternative reinstatement options.

## D. Brumbalough's Motion to Amend the Complaint

On January 23, 2004, approximately nine months after filing the original complaint, and approximately three months before trial was set to begin, Brumbalough attempted to amend her complaint to include damages for emotional distress.[6] The district court denied the amendment, finding that it would be both futile and prejudicial to Camelot.

### 1. Futility of Amendment

Whether a plaintiff is able to recover compensatory damages for emotional distress is an issue of first impression before this Court. However, several other circuits have held that the FMLA does not allow for such recovery.[7] *See Montgomery v. Maryland*, No. 02-1998, 2003 WL 21752919, at *2 (4th Cir. July 30, 2003) (unpublished) (discussing emotional distress damages); *Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1277 (10th Cir. 2001) (same); *Nero v. Indus. Molding Corp.*, 167 F.3d 921 (5th Cir. 1999) (discussing consequential damages); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (discussing emotional damages distress); *Cianci v. Pettibone Corp.*, 152 F.3d 723, 728 (7th Cir. 1998) (finding no damage claim under the FMLA when plaintiff suffered no actual monetary losses such as wages, salary, benefits, etc.). The underlying logic to these courts' conclusion is this: Because the FMLA specifically lists the types of damages that an employer may be liable for, and it includes damages only insofar as they are the actual monetary losses of the employee such as salary and benefits and certain liquidated damages, the FMLA does not permit recovery for emotional distress. *See* 29 U.S.C. § 2617(a)(1); *Walker*, 240 F.3d at 1277.

On appeal, Brumbalough argues that under *Arban v. West Publishing Corp*, 345 F.3d 390 (6th Cir. 2003), an FMLA case decided by this Court, she is entitled to recover compensatory damages for mental and emotional injuries. This Court in *Arban*, in relevant part, stated as follows:

> If the employer is found to have retaliated against the employee for using FMLA leave, the employer is subject to a claim for compensatory damages and, unless the court finds the violation occurred in good faith, additional liquidated damages. 29 U.S.C. § 2617(a)(1)(A).

345 F.3d at 403.

29 U.S.C. § 2617(a)(1)(A) provides that:

---

[6] Although the amendment makes mention of compensatory and liquidated damages in general, these were part of the original complaint. Therefore, the only claim that is new to the amended complaint is one for emotional distress damages.

[7] The only circuit, among the ones that have reached this issue, that has allowed recovery of compensatory damages under the FMLA for compensation for "mental anguish, loss of dignity, and other intangible injuries" is the Eighth Circuit. *See Duty v. Norton-Alcoa Proppants*, 293 F.3d 481 (8th Cir. 2002).

>Any employer who violates § 2615 of this title shall be liable to any eligible employee affected for damages equal to the amount of (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation; (ii) the interest on the amount described in clause (I); and (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (I) and the interest described in clause (ii) when the employer acted in bad faith.

The fact that the *Arban* court cites to § 2617 demonstrates that the words "compensatory damages" as used in *Arban* referred to the damages enumerated in 29 U.S.C. § 2617(a)(1)(A). This conclusion is consistent with the underlying logic of the cases from the other circuits disallowing damages for emotional distress under the FMLA. Therefore, we find that Brumbalough's reliance on *Arban* in claiming that this Circuit allows recovery of damages for emotional distress and injuries under the FMLA is misplaced.

Brumbalough also argues that she is entitled to recover damages for emotional distress because this Court has allowed such recovery for retaliation in violation of the Fair Labor Standard Act ("FLSA"), whose remedial provision Congress intended the FMLA to mirror. *See Moore v. Freeman*, 355 F.3d 558, 563 (6th Cir. 2004); *see also Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir. 1998). We do not find Brumbalough's argument persuasive.

Retaliation damages under the FLSA are controlled by 29 U.S.C. § 216(b) which provides, "any employer who violates the provisions of section 215(a)(3) of this title shall be liable for *such legal or equitable relief as may be appropriate* to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." (emphasis added). Such language is not found in the FMLA, and therefore a retaliation claim in violation of the FMLA does not warrant damages for emotional distress.

For the reasons stated above, we hold that damages for emotional distress are not allowed under the FMLA and affirm the district court's denial of Brumbalough's motion to amend complaint.

## 2. Prejudice to Camelot

As this Court's holding that damages for emotional distress are not allowed under the FMLA renders the amendment to Brumbalough's complaint futile, the Court needs not review whether the district court abused its discretion in finding that the amendment would have been prejudicial to Camelot.

## IV. CONCLUSION

For the reasons set forth above, the district court's denial of Brumbalough's motion for partial summary judgment is **AFFIRMED** and grant of Camelot's motion for summary judgment is **REVERSED**. The district court's denial of Brumbalough's motion to amend her complaint is **AFFIRMED**. We **REMAND** the case for further proceedings not inconsistent with this opinion.